**UNION CARBIDE & CARBON CORP. v. THE WALTER RALEIGH et al.**

United States District Court,
S. D. New York.

Aug. 1, 1951.

Hill, Rivkins & Middleton, New York City (Eugene P. McCue, Robert E. Hill and Richard T. O'Connell, New York City, of counsel), for libelant.

Hunt, Hill & Betts, New York City (John W. Crandall and Robert M. Donohue, New York City, of counsel), for respondent.

LEIBELL, District Judge.

On February 21, 1946, Union Carbide and Carbon Corporation filed a libel in

rem and in personam against the S.S. "Walter Raleigh", the American-West African Line, Inc., as operating agent,[1] and the United States of America, as owner. The libel alleges that 4400 tons of manganese ore were delivered to respondents, as common carriers, at Takoradi (West Africa) on March 31, 1945 in good order and condition for transportation to a United States Atlantic port, and that when the ore was delivered to libelant (the assignee of E. J. Lavino & Co., the consignee named in the Bill of Lading) at Philadelphia, on May 11, 1945, it was seriously damaged as a result of having come in contact with fuel oil. The damages sustained are estimated to be about $20,000.

The respondents filed an answer, October 1, 1948, which contained denials and certain special defenses. The first and second defenses were amended February 1, 1950. The *first* defense, as amended, alleges that:

"Eighteenth: If there was any damage to the said ore as a result of the contact with the oil it was due to the acts or neglect or default of the aforesaid members [Walsh, Gillis and Reed] of the engineering personnel of the Walter Raleigh in the management of the ship, to wit, their failure either to observe with sufficient diligence the inflow of the oil into the said deep tanks [the No. 3 port and starboard deep tanks] or to make adequate use of the hand operated equalizing valves on the fuel oil filling line or to notify the pumpman to slow down or stop the pump far enough in advance to insure against an overflow of the oil, and the respondent consequently is exempted from liability therefore by the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1304(2) (a)."

The *second* separate defense alleges the neglect of the engineers as above quoted, and that:

"Twenty-First: As soon as it was observed that the manhole had overflowed, the second assistant engineer ordered the pumpman on the lighter to stop the pumping, but the pumpman was slow in carrying out the order, resulting in additional oil overflowing through the manhole.

"Twenty-Second: If it should be found that the manganese ore was damaged as a result of contact with the oil, and that the acts and/or omissions of the said pumpman caused the said damage, the respondents are exempted from liability therefor under Title I, Section 4, paragraph 2(q) of the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1304(2)(q), the alleged damage having been due to causes arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier."

The *third* defense alleges that:

"Twenty-Fourth: The respondents were informed by the consignee, E. J. Lavino and Company, after the discharge of the ore at destination, that the ore had been imported for use in the manufacture of electric batteries, which is a chemical and not a metallurgical use, and the damage complained of is based upon the alleged unfitness of the ore for such chemical use and not for its metallurgical use in general. The alleged damage is therefore special damage.

"Twenty-Fifth: Prior to shipment and the making of the contract of carriage the respondents were not advised by the shipper or consignee and did not know that the ore was being imported for the special chemical use subsequently disclosed and therefore are not liable in any event for the damages claimed in the libel, which are special damages."

The *fourth* defense is a partial defense and alleges:

"Twenty-Seventh: On the ship's arrival at Philadelphia the said Lavino Shipping Company undertook to and did discharge the ore from the vessel

1. A stipulation dated January 10, 1950, discontinued the action against the American West Africa Line.

through its stevedoring division. Although the contact between the oil and the ore, for the reasons previously alleged, was confined to the forward port side of the No. 4 lower hold, the stevedores, although aware of conditions, made no effort to keep that ore separate and apart from the ore in the after part of that section of the hold or from the ore on the starboard side of the hold, which was separated from the port side by the shaft tunnel, but, as the respondents are informed and believe, intermingled all the ore from both sides of the No. 4 hold when discharging and loading it into railroad cars.

"Twenty-Eighth: If the ore on the forward port side of the hold was damaged by contact with the oil, which is not admitted, the libellant's alleged damages were aggravated by the said negligence of the stevedores. Should the respondents be found liable herein, liability being expressly denied, a corresponding reduction should therefore be made in the award of damages."

The third and fourth defenses relate to the issue of damages and need not be considered at this time, because a Commissioner will be named for that purpose. The first and second defenses claim exemption from liability by reason of certain provisions of the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1300 et seq., as applied to respondents' version of the facts in this case.

Although the trial originally terminated on March 10, 1950, it was found necessary to reopen the case twice and receive additional proof.

On January 10th, 1950 the proctors for the respective parties entered into a stipuation of certain facts as follows:

"1. That at the times stated in the libel, the libelant was the owner of the cargo described therein, had the legal status alleged therein, and is entitled to maintain this action.

"2. At the times stated herein the U.S.A. was the owner of the steamship Walter Raleigh, and if liability is found to exist herein it is solely responsible to Union.

"3. This action in so far as the respondent, American-West African Line, Inc. (hereafter called 'A.W.A.') is concerned, is to be discontinued without costs.

"4. The original appearance entered herein and all pleadings filed on behalf of the respondents are deemed to be an appearance and pleadings on behalf of U.S.A.

"5. The manganese in question was loaded in apparent good order and condition at Takoradi, West Africa, after which the Walter Raleigh, under the orders of War Shipping Administration (hereafter called 'W.S.A.') proceeded without convoy to Port of Spain, Trinidad, for bunkers where she arrived on or about April 21, 1945, in the morning.

"6. At the time in question and due to war conditions and the shortage of fuel oil on the Atlantic coast because of the large number of tankers which had been torpedoed, the W.S.A. ordered all vessels navigating through waters in the vicinity of Trinidad to fill up their bunkers with fuel oil there.

"7. Pursuant to the custom and practice and orders of the W.S.A. aforementioned, the steamer Walter Raleigh loaded the fuel oil at Port of Spain, Trinidad, in this instance. On her arrival at Port of Spain, she had aboard 2,460 barrels of fuel oil, and took aboard there 8,546 barrels of fuel oil. On her arrival in Philadelphia, on or about May 7, 1945, she had aboard 9,007 barrels of fuel oil, 1,561 barrels having been consumed on the voyage from Trinidad to Philadelphia via Guantanamo Bay, Cuba.

"8. On the Walter Raleigh's arrival in Philadelphia, she discharged her cargo of manganese ore. Some of the manganese ore which was stowed in the ship's No. 4 lower hold came into contact with the fuel oil loaded at Port of Spain, Trinidad, due to an overflow of the No. 3 port deep tank during load-

ing operations. It is conceded that such manganese sustained some damage as a result of the contact with the fuel oil, the amount of such damage, however, not being conceded by the U.S.A., which makes the aforesaid concession without prejudice to its claims herein.

"9. The Walter Raleigh discharged no fuel oil at Philadelphia and took out with her on her next voyage all the fuel oil she brought into Philadelphia, less what may have been consumed while she was at that port."

On May 7, 1951 another stipulation was entered into which cancelled Article 9 of the stipulation of January 10th and substituted for it the following:

"It Is Hereby Stipulated and Agreed by and between the proctors for the libellant and the respondent, United States of America, as follows:

"That Article 9 of the · stipulation herein, dated January 10, 1950, having, as it recently developed, been entered into without complete knowledge of the facts, and consequently being a partially incorrect statement with respect to fuel oil ·on the Walter Raleigh, be and the same hereby is cancelled and withdrawn, and that there be substituted in place thereof the following stipulation:

"The Walter Raleigh discharged no fuel oil at Philadelphia, and took out of Philadelphia all the fuel oil she brought into that port, less what may have been consumed while she was there. On or about May 28, 1945, when the Walter Raleigh was in the port of New York, American-West African Line, Inc., acting as agent and on the instructions of the War Shipping Administration, arranged with the Standard Oil Company of New York to remove about 6,200 barrels of bunker 'C' fuel oil from the Walter Raleigh, while she was lying at Pier B North side, Jersey City, N. J., starting at about 7 P.M. May 29th. The condition was made that unless the fuel oil barge removed all the oil specified by 7 A.M. on May 30th, she was to stop pumping at that time and leave the vessel with ·

whatever quantity of oil she, the barge, had on board. Pursuant to such instructions 3,902 gross (3802 net) barrels of fuel oil were discharged from the Walter Raleigh into the Standard Oil barge between 5:45 P.M., May 29 and 6:35 A.M., May 30, 1945. The difference of 100 barrels between the gross and net amounts of oil is accounted for by the expansion and contraction of the oil in the varying temperatures. This was all the oil that was removed from the ship while she was at the port of New York."

On March 10, 1950 the proctor for the libellant entered into a stipulation of facts as follows:

"1. That this stipulation is in addition to and does not supersede the stipulation hereinbefore entered, dated January 10, 1950. .

· "2. That if an employee or official of War Shipping Administration were called as a witness in this litigation, such witness would testify that the bunkering operations of the S.S. Walter Raleigh, during the times involved in this litigation, were controlled by 'Operations Regulation No. 10' dated August 27, 1942, photostatic copy of which is annexed hereto and marked 'Exhibit A'.

"3. That if an employee or official of War Shipping Administration were called as a witness in this litigation, such witness would testify that 'Operations Regulation No. 10' was superseded by 'Operations Regulation No. 10 (Revised)' dated October 26, 1945, photostatic copy of which is annexed hereto and marked 'Exhibit B'.

"4. That if an employee or official of the United States Maritime Commission were called as a witness in this litigation, such witness would testify in substance in accordance with the statements contained in a letter dated February 23, 1950 addressed to John W. Crandall, Esq., photostatic copy of which is hereto annexed and marked 'Exhibit C'.

"5. That if an employee or official of Gibbs and Cox, Inc. were called as a witness in this litigation, such witness would testify regarding the dimensions of the manhole openings of the No. 3 deep tanks of the S. S. Walter Raleigh in accordance with the statements contained in the letter dated February 8, 1950 addressed to proctors for respondent, photostatic copy of which is hereto annexed and marked 'Exhibit D'.

"6. That the said Operations Regulation No. 10 establishes that the War Shipping Administration arranged for the bunkering of the S. S. Walter Raleigh at Trinidad on or about April 21, 1945.

"7. That the master and crew of the S. S. Walter Raleigh put into Port of Spain, Trinidad, on or about April 21, 1945, for the purpose of bunkering, pursuant to orders issued by respondent."

The first paragraph of Exhibit A and the first two paragraphs of Exhibit B, referred to in the stipulation of March 10, 1950, are hereinafter quoted.

Exhibit C, mentioned in the stipulation of March 10, 1950, relates to a contention of the libellant that the stop of the S. S. "Walter Raleigh" at Port of Spain was an unreasonable deviation from the route or course the ship was to follow on its voyage, and constituted a breach of the contract of carriage and of the Carriage of Goods By Sea Act, depriving respondents of the exemptions of that Act. The letter to respondent's proctor (Mr. Crandall) from the solicitor of the United States Maritime Commission, dated February 23, 1950, stated:

"At your request, a search was made in the files of the Commissioner for any orders to the Master of the Walter Raleigh directing him to call at Trinidad, B.W.I. Insofar as the records of the Commission are concerned they concerned they contain no notation to that effect; however, at our request, the Navy Department consulted its records and advised that the naval rout-ing orders directed the Raleigh to proceed from Takoradi, South Africa to Trinidad. This would indicate that the vessel was not diverted but was stopping at Trinidad for bunkers, as was customary with all vessels joining the Guantamano convoys."

At the trial of this action two depositions of Walsh, the Chief Engineer of the S. S. Walter Raleigh were offered in evidence. The first deposition was taken on April 24, 1947 and the second was taken on March 19, 1951, when it became necessary to take additional testimony. There were 13 exhibits (A to M) attached to Walsh's first deposition but none were attached to his second deposition. The Depositions of Gillis, the Second Assistant Engineer (taken December 8, 1947) and of Reed, the deck engineer (taken June 20, 1949) were also offered in evidence along with the depositions of Joyce, the Chief Engineer aboard the S. S. Walter Raleigh (taken March 2, 1951) and that of Campbell, the Superintendent Engineer of the American-West African Line, Inc. (taken April 6, 1951). Exhibit IX–A was attached to Joyce's deposition and exhibits XI to XVI were annexed to Campbell's deposition. All were received when the trial was reopened on May 11, 1951. No exhibits were attached to the depositions of Gillis or Reed. Certain other exhibits, such as the Bill of Lading and a contract of carriage referred to therein, and diagrams and plans showing the location of the No. 3 deep tanks, were also received in evidence at the trial. Only two witnesses testified before the trial court. They were Frick, who testified as an expert for respondent, and Stanley, who testified as an expert for libelant on rebuttal.

The S. S. Walter Raleigh was a Liberty type ship built about 1943. She left the Port of New York on her seventh voyage on December 28, 1944, with a cargo of war munitions and other war material. Her voyage was from New York across the Atlantic through the Mediterranean and the Red Sea to Calcutta, India; thence to Colombo, Ceylon, for bunkers; thence to Capetown, South Africa, where she discharged about 1000 barrels of her supply

of fuel oil at the direction of the War Shipping Administration; thence to ports on the West Coast of Africa including Takoradi, where she took aboard the manganese ore and mahogany logs; thence to Port. of Spain, Trinidad, for bunkering additional fuel oil; thence to Guantanamo, Cuba, to join a convoy to the United States. She arrived at Philadelphia on May 6, 1945.

During the period covered by the voyage there was a serious shortage of fuel oil on the Atlantic Coast due to war conditions. The War Shipping Administration had ordered all vessels navigating through waters in the vicinity of Trinidad to fill their bunkers to capacity with fuel oil at that place. Operations Regulation No. 10 of the War Shipping Administration (dated August 27, 1942) provided:

"In the past all Agents and General Agents of WSA were directed to place their own orders for bunkers at foreign ports, and to supply us certain information on our 'Bunker Schedule'. This information was not always submitted in time or in such form as to meet our requirements. Furthermore, shortages of bunker stocks at world wide ports, increased difficulties of transportation, re-routing of vessels and consequent changes in foreign loading and discharging ports have added to our problem, and we now consider it necessary to assume full control of bunkering WSA owned or chartered vessels at all ports outside of the continental United States. The Agents and General Agents of WSA will still be responsible for ordering bunkers at United States ports."

At the end of World War II Operation Regulation No. 10 was revised (October 26, 1945). Two introductory paragraphs in the revision recited:

"Operations Regulation No. 10 dated August 27th, 1942 provided for the purchase of bunker oil by Agents and General Agents at continental United States ports, and further provided for the Bunker Fuel Section of the War Shipping Administration to make all arrangements and order all bunkers required by WSA owned or chartered vessels outside of the United States.

"Since the end of hostilities has removed security regulations, convoys, etc., there is no longer any need for centralized ordering of foreign bunkers. Furthermore as stock of bunker oils now are available in adequate quantities at most normal bunkering ports throughout the world, and transportation difficulties no longer exist, it is considered advisable to return control of bunkering operations of WSA ships to the respective Agents."

Pursuant to the Regulation (dated August 27, 1942) the "Walter Raleigh" after leaving a West African port proceeded to Port of Spain, Trinidad, and arrived there April 21, 1945, to take on bunkers. At that time a representative of the WSA boarded the vessel and directed the master to bunker 9,000 barrels of fuel oil. The vessel did not require any additional oil to complete the voyage to Philadelphia. There were in the ship's tanks 2,460 barrels of oil on arrival at Trinidad. The chief engineer estimated that about 1,600 barrels of oil would be used in completing the voyage to Philadelphia and that an additional 25% would be a proper reserve for an emergency. The ship used only 1561 barrels on the voyage from Trinidad to Philadelphia, by way of Guantanamo, Cuba. The vessel took on 8,546 barrels of fuel oil at Port of Spain, in compliance with the instructions of the WSA and used part of the oil on a subsequent voyage. Another part (3,802 barrels) was off-loaded at Jersey City, New Jersey, as is indicated by the stipulation entered into by the proctors for the respective parties on May 7, 1951.

On April 18, 1945, several days before the vessel's arrival at Trinidad, the sounding tube of the No. 3 port deep tank became jammed and useless when the sounding chain broke while the Second Assistant Engineer was making a routine sounding. Efforts to remove the sounding rod and chain from the sounding tube of the No. 3 port deep tank were unsuccessful.

The day before the vessel arrived at port of Spain a leak was discovered at a joint in

a valve of the automatic equalizing line of the No. 3 port and starboard deep tanks, when the oil from those tanks was being gravitated to the Nos. 1 and 2 double bottom tanks, forward. The leak rendered inoperative the automatic equalizing system, because the oil leak constituted a fire hazard in the engine room. The main purpose of the equalizing line was to equalize the quantity of oil in the No. 3 port and starboard tanks. Walsh, the chief engineer, concluded that because the valve was difficult to reach, the repair of the equalizing line valve was a job for a shipyard.

That was the condition of the "Walter Raleigh" when she anchored in Port of Spain on April 21, 1945 at 7:33 A.M. It does not appear that this condition was reported to the WSA agent when he came aboard for an hour at 9:20 A.M. At about 5:30 P.M. an oil barge of the Shell Oil Co., the "Juanita", came alongside and hooked up to the filling line of the "Walter Raleigh" on the starboard side of the ship.

The bunkering operation commenced at 6 P.M. and was supervised by the Chief Engineer Martin L. Walsh, who was aided by Second Assistant Engineer Robert R. Gillis and Deck Engineer James J. Reed. At the time the pumping started the vessel had a slight list to port about one degree, which had developed when the oil in the No. 3 deep tanks was being transferred by pumping to the Nos. 1 and 2 double bottom tanks. It had been caused by a shifting of some mahogany logs, stowed in the No. 4 hold above the manganese ore. The logs were about four feet in diameter and some of them were 50 feet long; they extended up through the 'tween decks to below the main deck.

The fuel oil taken on at Port of Spain was pumped from the barge into the No. 3 deep tanks, which are located aft of amidships and just forward of the No. 4 lower hold. At the same time the oil was being gravitated from the No. 3 deep tanks into the No. 5 and No. 6 double bottom tanks, situated aft of the No. 4 hold. The overhead intake oil lines are larger than the lines through which the oil gravitates to the double bottom tanks, so that in the course of the pumping the oil accumulated in the deep tanks faster than it gravitated into the double bottom tanks.

Located at the top of the No. 3 port and starboard deep tanks, on the 'tween decks, were two manholes, about three feet forward of the hatch opening into the No. 4 lower hold. These manholes had steel covers which were dogged down by nuts and bolts. Over the covers were cover guards. Before the bunkering began on April 21, 1945, the manhole guards and covers were removed by Reed in order to permit him to see the oil as it rose in the deep tanks.

Several hours after the pumping operation started the Deck Engineer, Reed, took his station on the 'tween deck at the open manholes of the No. 3 port and starboard deep tanks to observe the amount of oil in each tank and the speed of the flow. A ladder led from the 'tween decks, near the manholes, to the main deck, where Gillis was stationed.

Reed testified that at approximately 10:30 P.M., he called up to Gillis, who was on the main deck, that the port deep tank was filling too rapidly and that the pumping should be slowed down; that Gillis ordered the pumpman on the oil barge to slow down, but the pumpman was slow in doing so; that five or six minutes later Reed noticed that the oil was still rising rapidly, so he went up the ladder and told Gillis that the pumping should be stopped; that Gillis so instructed the pumpman who was slow in complying; that as Reed was descending the ladder to the 'tween deck the oil overflowed from the manhole of the No. 3 port deep tank. Some of the oil spilled into the No. 4 lower hold and came in contact with the manganese ore.

The libelant contends: (1) that the call at Port of Spain to load fuel oil for use on a subsequent voyage was an unreasonable deviation from the course of the voyage and that respondent should therefore be denied the statutory and bill of lading exemptions; (2) that since part of the fuel oil loaded at Trinidad was for a subsequent voyage and since a portion of the oil was off-loaded at Jersey City, N. J., apparently for use by

some other vessel, it constituted cargo, and hence its loading was an operation related to the care and custody of cargo, and that damages arising from that type of operation are a fault of the shipowner, not exempted by the Carriage of Goods by Sea Act; (3) that the ship was unseaworthy when she broke ground in New York December 28, 1944, and at the time of the bunkering operation at Port of Spain; (4) that when the representative of the War Shipping Administration came aboard in relation to the amount of fuel oil to be taken, his activity constituted an intervention of the owner and that any negligent acts of the ship's servants and the pumpman on the barge are therefore imputable to the owner; (5) that respondent has failed to show that it exercised due diligence in the inspection of the unseaworthy parts (the valve on the equalizing line and the sounding chain) prior to the commencement of the voyage December 28, 1944; and (6) that the unseaworthiness of the vessel was a proximate and efficient cause of the damage to the manganese ore.

The respondent contends that there were acts of negligence on the part of the ship's officers, the engineers, and on the part of the barge pumpman, which were the proximate cause of the damage, and that under 46 U.S.C.A. § 1304, Subsecs. (2) (a) and (2) (q), the Carriage of Goods by Sea Act, respondent is not liable for their negligence. Respondent further contends that if the ship was unseaworthy at the time the oil overflowed, it was a condition that developed some months after she broke ground at the start of her voyage in New York, that the respondent exercised due diligence in making the ship seaworthy before she started on her voyage as required by § 1303 (1) (a) of T. 46 U.S.C.A. and is therefore entitled to immunity under § 304 (1); and further that the acts of negligence of the ship's crew and the pumpman intervened between the unseaworthy condition and the overflow and that the unseaworthiness was not the proximate cause of the damage.

The circumstances under which the "Walter Raleigh" bunkered at Trinidad show that there is no merit in libelant's first two points. World War II was in progress. At the time all shipping was under the control of WSA, and vessels filled their bunkers at ports specified by the WSA under Operations Regulation No. 10, dated August 17, 1942. There was a shortage of fuel oil on the Atlantic Coast. Bunkering at Port of Spain was in the nature of a war measure. All ships, when in that area, were subject to the same order pursuant to which the "Walter Raleigh" called at the Port of Spain. The WSA was in control of all United States shipping at that time.

Chief Engineer Walsh testified that it was customary to take on fuel at Trinidad, and that he had done so many times while serving aboard Liberty ships during the war. Paragraph 3 of the Bill of Lading provides in part as follows:

"The scope of voyage herein contracted for shall include usual or customary or advertised ports of call whether named in this contract or not, also ports in or out of the advertised, geographic, usual or ordinary route or order, even though in proceeding thereto the ship may sail beyond the port of discharge or in a direction contrary thereto or return to the original port, or depart from the direct or customary route, and includes all canals, straits and other waters. The ship may call at any port for the purposes of the current voyage or of a prior or subsequent voyage."

The fact that the "Walter Raleigh" took aboard oil far in excess of its needs for the voyage to Philadelphia did not make the excess oil "cargo". Nor is the libelant's contention to that effect strengthened by the off-loading of a part of that excess oil at New York. The extraordinary circumstances prevailing at the time required such action in the interest of the vessel. Further, it does not appear that the excess oil was carried as cargo on any of the ship's documents. A part was used by the ship on its next voyage and as has been indicated above, a part was off-loaded at New York, probably for use by some other vessel under the WSA. No evidence has been adduced

to show that respondents were not acting in accord with the directions of the WSA. Assuming arguendo, that the stop at Port of Spain was a deviation, it was not for the purpose of loading "cargo" in the usual sense.

The call at the Port of Spain was within the language of the Bill of Lading and was a reasonable and permissible deviation under the Carriage of Goods by Sea Act.[2]

As to libellant's fourth point, that the War Shipping Administration's agent intervened at Port of Spain, and on behalf of the owner took control of the ship from the master and crew when he ordered them to take on 9,000 barrels of fuel oil, the evidence fails to support that contention. He gave the order to bunker the oil and sent the oil barge "Juanita" to the ship, but the master was in charge of the ship and the ship's engineering officers directed and controlled the manner in which the oil was taken aboard and the tanks into which it was pumped. Further, there is no proof that the Agent had knowledge of the then unseaworthy condition of the ship due to her defective automatic equalizing system and the jammed sounding tube. Neither the master nor the agent was examined. The rough deck log shows that the agent came aboard at 9:20 A.M. and departed at 10:24 A.M. with the master. The chief engineer testified on deposition that the agent ordered that the ship be bunkered to capacity. But the chief engineer and his assistants did the rest. The agent was not aboard when the bunkering operation was in progress. The agent's action was not at all comparable to that taken by the owner's representatives in the case of May v. Hamburg-Amerikanische Packetfahrt Aktiengesell (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348. The action of the agent at the Port of Spain did not have the effect of breaking up the voyage, as hap-

pened in The Isis case. When the S. S. Walter Raleigh left Port of Spain April 22nd, 1945, at 7:42 A.M. she was not "breaking ground" on a new voyage. She was continuing on her voyage as planned. Unless there is some intervention of the owner, in the course of the voyage, of such a character as to take over the control of the ship, the voyage is one and unbroken. The seaworthiness of the ship "is measured by her fitness in all respects to fulfill the purposes of the voyage" when she breaks ground and begins her voyage. "Adjustments made necessary by subsequent events pertain to her management and cannot touch her seaworthiness." The Steel Navigator, 2 Cir., 23 F.2d 590 at page 592.

In the case at bar the evidence is to the effect that the defective condition of a valve on the automatic equalizing line connecting the No. 3 deep tanks was not discovered until a day or two before the "Walter Raleigh" reached Port of Spain. The defect was noted when oil, then in the No. 3 deep tanks, was being shifted to the No. 1 and No. 2 double bottom tanks, forward of amidships. At least that was the testimony of Walsh and Gillis. The equalization line extends into each tank, the port and starboard, and connects the two. At each end of the line there is an automatic valve which can be shut off at the floor of the engine room. When both the automatic equalization valves are open they maintain the oil in each deep tank, the port and starboard, at approximately the same level. That is their function, as the expert Stanley testified.

On December 16, 1944, while the vessel was in New York, 5641 barrels of oil were pumped into the No. 3 deep tanks and then gravitated to the double bottom tanks, under the direction of Chief Engineer, William J. Joyce.[3] According to Joyce, the oil was loaded by means of the overhead

2. 46 U.S.C.A. § 1304(4) provides:
   " (4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

3. The engineer's smooth log for the period the S. S. Walter Raleigh was in the port,

filling line and the level of the oil in the deep tanks was controlled by the manual operation of the two valves on the overhead filling line. The equalization line between the two No. 3 deep tanks was not used. So he testified, but there does not appear to be any good reason for not using it, unless it was out of order, which I believe was the fact.

Walsh replaced Joyce as Chief Engineer on December 19, 1944. On December 28th, the ship took on an additional 2000 barrels of oil, according to the engineer's log. Walsh testified that this was pumped into the No. 3 deep tanks, but the engineer's log does not show what tanks it was put in. Walsh testified that when the 2000 barrels were pumped aboard, he did not use the equalizing line because he could sound the No. 3 deep tanks there and could control the flow to the port and starboard tanks by operating valves on the overhead intake lines—the valves located on a platform at the bulkhead in the engine room. He also testified that save on the occasion when the leak was discovered, the equalizing line was not used on the trip. This explanation is not satisfactory in view of the understandable testimony of the expert, Stanley.

There was a further bunkering operation at Colombo, Ceylon, on February 22, 1945, when 9032 barrels were pumped aboard. The control valves of the overhead filling line was used exclusively in this operation, according to Walsh.

The defect rendering the equalizing line inoperative consisted of a leak in the joint between the valve itself and the equalizing line. The joint was constructed of asbestos sheet packing and the leak could be corrected by replacing the packing. This according to Walsh, was a "shipyard job" because the valve was in an inaccessible place. The port and starboard bilge lines, the oil filling lines running forward to aft, and the water lines were all near the defective valve.

Both Joyce and Walsh testified on the question of due diligence in the inspection of the equalizing valves before the ship broke ground in New York. Joyce testified that before the fueling commenced on December 16th, he closed the equalizing valves since the equalizing system was not going to be used. At that time he noticed no leaks, and to his knowledge there were none then existing in the equalizing line. During this same operation he looked at the valves at least once and saw no indication of a leak. On cross-examination it was brought out that at the time Joyce closed the valves, there was no oil in the tanks and hence none in the line. Obviously there was no oil to leak and no pressure to force any liquid through the leak. His observation of the valves in the course of the bunkering operation at New York has little weight, since the valves were closed and no oil was running through the line, although there was oil pressure in the tank. Apparently the leak was in place where its presence could be noted only if the valves on the equalizing line were open. According to the testimony, the leak was

of New York, contains, among others, the following entries:

"Dec. 16/44; 12/4 A. M.

"Fuel barge Socony #83 alongside and made fast 12:15. Started pumping at 1:40. * * * Fuel barge finished pumping at 7:45." * * * "8/12 A. M. Gravitating fuel oil from after deep tanks to #2, 3, 5 and 6 double bottom fuel oil tanks. * * *". (The after deep tanks were the #3 port and starboard deep tanks.) 4/8 P. M. * * * Gravitating fuel oil from #3 deep tanks to all double bottoms. "8/12 P. M. Received 5641.-33 Bbls of fuel oil." Fuel Oil: Remaining previous day, 1978; Received 5641.33; consumed 32.33; remaining at noon 7587. Dec 19/44 "William J. Joyce relieved as

Chief Eng by Martin L. Walsh". Dec 28/44, 4/8 A. M. "Oil Barge Socony #55 alongside at 5:30 and started to pump at 6:15. Finished pumping at 8:15. Took 2041.77 Bbls. gross. 2001.54 Net. Total Fuel on board 9088.54 Bbls. * * * Fuel Oil; Remaining previous day 7087; received 2001.54; consumed 35; Remaining at Noon 9053." The ship sailed sometime after 4 P. M. on December 28, 1944. The engineers log does not show into what tanks the oil was pumped from the barge on December 28, 1944. William S. Parsons was the engineer on watch between 4 and 8 A. M. The engineers smooth log for that day is signed by Walsh, the chief engineer.

discovered as soon as the equalizing line was used, and that is when the valves on the equalizing line were opened while the oil was being transferred to the Nos. 1 and 2 double bottom tanks forward, shortly before the vessel reached Port of Spain.

■ Joyce testified to the behavior of these same valves during the voyage just preceding that on which the leak was discovered. He said that the equalizer was used only to ballast and unballast the vessel and no hint of a leak was discovered. Salt water was taken on as ballast in the Mediterranean in the No. 3 port and starboard deep tanks and it was discharged a day before entering New York in December 1944. At best there was only a residue of oil in the tanks when the salt water ballast was taken aboard, and oil will leak through when water will not. An oil leak would be more readily noted. Even assuming that the valves had previously given no trouble, that fact, while relevant, is not conclusive on the issue of seaworthiness. Edmond Weil, Inc. v. American West African Line, 2 Cir., 147 F.2d 363.

■ The rule as to inspections requires that the inspection be made before the vessel breaks ground. Seaworthiness of a part of the ship's equipment on the voyage just ended is not sufficient. Some thing might happen to the equipment while the vessel is in port. It may be because of this possibility that a proper inspection is supposed to be made prior to commencement of each voyage.

As has been previously pointed out Walsh's deposition was taken on two occasions; the first time on April 24, 1947 and the second time on March 29, 1951. In the course of his first deposition, Walsh was asked whether he had made an inspection of the defective valve prior to commencement of the voyage. He answered in the negative. On his second deposition he reversed this statement and said that he had inspected the valves in the course of an inspection of the engine room, while accompanied by Joyce. This is contrary to Joyce's testimony, that to his knowledge no one but himself inspected the equalizing line equipment of the deep tanks. Apart

from the discrepancy, the inspections which Walsh and Joyce purportedly made were only visual and were insufficient. The valves on the equalizing line were never opened between the time the sea water ballast was pumped overboard before the vessel entered New York harbor on the end of her prior voyage in December 1944 and the time the valves were opened on the equalizing line to gravitate the oil to the double bottom tanks shortly before the vessel entered Port of Spain.

There are certain physical facts in this case which cannot be disputed and which are important in a determination of the issues. (1) If the manhole covers had not been taken off the No. 3 deep tanks the oil could not have overflowed into the No. 4 hatch where the manganese ore was stowed. (2) If there were available a means of determining how the oil was rising in both the port and starboard deep tanks, it would not have been necessary to remove the covers of the manholes of those tanks. (3) It was necessary to know that the oil was rising evenly in both tanks because if it rose faster in one tank than in the other and one tank became completely filled before the other, the additional pressure on the line leading into the filled tank, if the pumping operation continued might cause an oil pipe to burst unless the oil was cut off from the pipe leading into that tank. (4) It was important to have the oil rise evenly in the two tanks in order to prevent a list. (5) The sounding tubes leading from the main deck reached into both the port and starboard No. 3 deep tanks and if both tubes were clear and the tanks could be sounded, an even flow of oil into each tank could be controlled by the man at the valves on the overhead intake lines in the engine room. (6) If the equalizing line connecting the port and starboard No. 3 deep tanks had been working it would have controlled the rise of the oil in both tanks so that the rise would be even. (7) If the equalizing line had been working and the rise of the oil in each tank was even, then by sounding only one of the tanks from the main deck the depth of the oil in both tanks could be ascertained; and the fact that one sounding tube was out of commis-

sion would not require the opening of the manholes if the equalizing line had been working. (8) It was the combination of circumstances—the defective valve on the equalizing line and the defective sounding chain caught in the port sounding tube, that made it necessary to open the manholes to observe the rise of the oil in the No. 3 port and starboard deep tanks at the Port of Spain.

In this case I am filing herewith Findings of Fact and Conclusions of Law. The following are quoted from the Findings of Fact:

"40. If the port sounding tube had not been plugged and if the valve on the equalizing line were not leaking, the manhole covers of the No. 3 deep tanks need not have been removed at Port of Spain in order to ascertain how the oil was rising in the deep tanks. If the manhole covers had not been removed the manganese cargo would not have been damaged by the oil overflowing from the manhole of the No. 3 port deep tank into the No. 4 hold.

"41. There was a direct causal connection between the defective condition of the equalizing line and of the port sounding tube and the overflow of the fuel oil from the No. 3 port deep tank.

"42. The overflow of the oil from the No. 3 port deep tank was due to several concurrent causes, as follows:

"(a) To the unseaworthy condition of the valve on the automatic equalizing line connecting the port and starboard No. 3 deep tanks;

"(b) To the unseaworthy condition of the sounding chain which got stuck and broke in the sounding tube of the No. 3 port deep tank;

"(c) To the mismanagement of the engineers in charge of the loading of the oil—in that Reed failed to observe the rise of the oil in the No. 3 port deep tank in time to notify Gillis to have the barge stop pumping before the overflow; and in that Reed, Gillis and Walsh failed to so coordinate their efforts (with the aid of other crew members) that they could easily communi-

cate with each other from the manholes of the No. 3 deep tanks to the main deck and to the valves on the overhead oil intake lines at the bulkhead in the engine room and act promptly in controlling and equalizing the flow of oil into the No. 3 deep tanks."

The respondent is liable for the damage to the manganese ore caused by the overflowing oil. The carrier has the burden of showing that the loss was due to one of the excepted causes. Further, the carrier has the burden to show that it used due diligence to make the vessel seaworthy for the voyage. American Tobacco Co. v. The Katingo Hadjipatera, D.C., 81 F.Supp. 438. If it appears that there may have been several concurring causes of the damage, the burden is on the carrier to show that it was due to one of the causes excepted under the Carriage of Goods By Sea Act. And if it is shown that more than one cause was an effective and proximate cause of the damage and that one of the causes was the unseaworthiness of the vessel, the fact that the other cause was an expected cause under the Act does not relieve the carrier from liability. If unseaworthiness resulting from the carrier's failure to exercise due diligence to make the vessel seaworthy concurs with negligent management of the vessel by the officers, the carrier is liable. The Temple Bar, D.C., 45 F.Supp. 608. The same is true if the pumpman on the barge were negligent but I do not believe he was. Gillis and Reed tried to shift the blame to the pumpman to excuse their own neglect. George F. Pettinos, Inc. v. American Export Lines, D.C., 68 F.Supp. 759, affirmed 3 Cir., 159 F.2d 247; Wessels v. The Asturias, 2 Cir., 126 F.2d 999; Sanib Corp. v. United Fruit Co., D.C., 74 F.Supp. 64.

The carrier does not show due diligence in the inspection to ascertain the vessel's seaworthiness, unless the inspection is something more than visual. Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 137 F.2d 326. Valves should be tested under pressure, not just looked at when not under pressure. Although a car-

rier may be relieved from liability where the damage is caused by a latent defect, there is no proof in this case that any defect in the equalizing valve or the sounding chain was latent. A true latent defect is a flaw in the metal and is not caused by the use of the metallic object. "A latent defect is one that could not be discovered by any known and customary test". It is not the result of a gradual deteroriation. Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 155 F.2d 687. If more than one means is required to effect seaworthiness, the lack of any one of them cannot be excluded. The Temple Bar, D. C., 45 F.Supp. 608, 617.

If the defect which makes the ship unseaworthy is one that the officers can correct on the spot and in a short time with material available, such a defect does not make the vessel unseaworthy. Middleton & Co. (Canada), Limited v. Ocean D. S. S. Corp., 2 Cir., 137 F.2d 619. But the two defects in the case at bar were not of that type. The defective valve on the equalizing line was in an inaccessible place and required the attention of a shipyard according to Walsh, the chief engineer. The defective sounding chain and rod clogged up the sounding tube in such a way that they could not be removed before the loading operation at Trinidad, although Gillis tried to do so. In fact they were not removed from the tube until several days after the loading operation was completed.

I have made the following Conclusions of Law:

"I. The libelant, as the owner of the manganese ore on the S. S. 'Walter Raleigh' is entitled to maintain this action. The defendant, United States of America, is the proper defendant and is liable for the damage sustained by libelant as a result of the overflowing of oil from the No. 3 port deep tank into the No. 4 hold where libelant's manganese ore was stowed."

"III. Due diligence was not used to make seaworthy the equalizing line and the sounding rod chain, prior to, at the commencement of, or at any time during the voyage of the 'Walter Raleigh'.

"IV. The 'Walter Raleigh' at the time of loading oil at Trinidad was unseaworthy with respect to her equalizing line and her sounding tube for the No. 3 port deep tank.

"V. The respondent having bunkered oil in an unseaworthy vessel and the unseaworthiness of the vessel having been an efficient and concurrent cause [T. 46 U.S.C.A. § 1304(1)] of the overflow of the oil into the hold in which libelant's manganese ore was stowed, the respondent is liable for the damage to the ore caused by its contract with the oil.

"VI. The negligence of the management of the vessel during the bunkering of the oil was a concurrent and efficient cause of the overflow of the oil into the No. 3 port deep tank. But that mismanagement was a risk to which the unseaworthy condition of the vessel exposed libelant's cargo and accordingly the Carriage of Goods By Sea Act [T. 46 U.S.C.A. § 1304(2) (a)] does not exempt respondent from liability for the damage to libelant's ore caused by the overflowing oil."

Libelant may submit an interlocutory decree with the usual provision for a Commissioner to assess the damages.