Merlin RINGERING, Plaintiff,

v.

COMPANIA MARITIMA DE-LA-MAN-CHA (in Personam), and the vessel M/V TRAVEMAR AFRICA (in rem), Defendants.

Civ. No. 86–105–PA.

United States District Court,
D. Oregon.

March 9, 1987.

302

Jack Ofelt, Jr., Portland, Or., for plaintiff.

Craig C. Murphy, Wood, Tatum, Mosser, Brooke & Landis, Portland, Or., for defendants.

## OPINION

PANNER, Chief Judge.

Plaintiff Merlin Ringering brings this action in admiralty against Compania Maritima De-La-Mancha (Compania), and the vessel M/V Travemar Africa (Africa) for negligence, unseaworthiness, and violations of the Jones Act. Prior to trial, plaintiff withdrew the Jones Act claims. A court trial was held from December 17, 1986 to December 22, 1986. I find the handrail is unseaworthy, defendants were negligent, and plaintiff was 20% contributorily negligent. Defendants are liable for plaintiff's economic loss from January 22, 1986 to December 19, 1986 in the amount of $72,-328, and $78,903.27 for each of the next two years, plus general damages of $100,-000, plus medical expenses, which are all to be reduced by 20%.

## BACKGROUND

Plaintiff is a Columbia River boat pilot. He was injured on board the Africa, which is owned and operated by Compania.

Plaintiff is self-incorporated and employed by Merlin Ringering, Inc. He was employed by Compania to pilot the Africa from Terminal 2 in the Willamette River, Portland, Oregon, to anchorage in the Columbia River at Vancouver, Washington.

On January 22, 1986, plaintiff boarded the Africa at 4:45 a.m. by the starboard accommodation ladder. That ladder is an exposed ladder which connects the main deck to the accommodation deck above. When he arrived, plaintiff was met by a seaman who escorted him to the bridge. On the way, they crossed the accommodation deck which was covered with over an inch of murky water. It rained all morning.

After completing the trip at 6:45 a.m., the same seaman escorted him off the vessel. They followed the same route. The accommodation deck was still flooded with murky water. It was raining harder, and the water was deeper. The escort proceeded down the accommodation ladder with both hands slightly in front of him on the rail. Plaintiff followed in the same manner. The escort was approximately three steps ahead of him. The escort reached the main deck and continued straight ahead a few steps. Plaintiff slipped and fell as he descended onto the last step.

Plaintiff was airlifted from the vessel and taken to the hospital. Initially, Dr. Robert Berselli treated plaintiff for a broken ankle and persistent back pain. Plaintiff had an old fracture to his lumbar spine. At first, Dr. Berselli thought that plaintiff had reinjured his back and suffered from a back sprain. Plaintiff was hospitalized from January 22, 1986 through January 29, 1986. He was placed in a leg cast, given painkillers, and ordered to have plenty of bedrest. When his back pain continued, plaintiff was referred to Dr. James Misko, a neurosurgeon. On September 29, 1986, Dr. Misko ordered an MRI scan. The MRI showed that plaintiff suffers from a ruptured disc of the thoracic spine at T–3 to T–4.

## JURISDICTION

This court has original jurisdiction of these claims pursuant to 28 U.S.C. § 1333.

## DISCUSSION

■ In maritime law, the applicable standard of care turns on the status of the plaintiff. *Craig v. M/V Peacock*, 760 F.2d 953, 955 (9th Cir.1985). If a seaman, plaintiff is entitled to traditional maritime remedies under the doctrine of seaworthiness. *Id.* As a seaman, plaintiff is not limited to recovery under the Longshoremen's and Harbor Workers' Compensation Act of 1927 (Longshoremen's Act). *See* 33 U.S.C. § 905 (Longshoremen's Act exclusive remedy, where applicable). The Ninth Circuit has adopted a three-part test to determine seaman status: "(1) The vessel on which the claimant was employed must be in navigation, (2) The claimant must have a more or less permanent connection with the vessel, and (3) The claimant must be aboard primarily to aid in navigation." *M/V Peacock*, 760 F.2d at 956. A river boat pilot is "taken on board at a particular place for the purposes of conducting a ship through a river, road or channel, or from or into port." *Clark v. Solomon Navigation Ltd.*, 631 F.Supp. 1275, 1277 (S.D.N.Y.1986). A pilot is considered a "master or member of a crew." 22 Op. United States Employee's Compensation Comm'n, 1928 AMC 263 (Nov. 27, 1927). Plaintiff was on board the Africa to navigate the ship. The ship was in navigation while he was aboard and plaintiff's connection with the Africa was "more or less" permanent. Plaintiff is entitled to the benefit of the doctrine of seaworthiness. *Clark*, 631 F.Supp. at 1283.

The doctrine of seaworthiness requires that a vessel be reasonably fit for its intended purpose. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971). Plaintiff contends that the handrail on the starboard accommodation ladder was too short for its intended purpose. Plaintiff also contends that the accommodation deck was unseaworthy because it collected dirty water. In the alternative, plaintiff contends that defendants were negligent for failure to correct these conditions.

### 1. *Ladder Rail.*

The ladder rail is seaworthy if it is "within the usual and customary standards of

the calling." *Boudin v. Lykes Brothers Steamship Co.*, 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354 (1955). There was extensive evidence at trial comparing the ladder rail at issue with other ships' ladders.

Plaintiff testified that in his twenty years of experience he had never seen a ladder and rail like the one on the Africa. He explained that if a ladder has a short rail then it would be placed at a much steeper angle. Similarly, Captain Doug Kruger testified that in his twenty-five years of experience he had never seen a ladder at a comparable angle as the one at issue, with such a short rail. Captain Kruger explained that on a mild slope the rail needs to be longer so as to be accessible at the lower steps. If the ladder is at a steep slope, then the rail need not be as long to be accessible at the bottom.

Photographs of the ladder show that the handrail is attached just above the third step from the bottom. Plaintiff's Exhs. 43, 44. The rail extends just above the second step. *Id.* A videotape showed that a person descending the ladder must let go of the handrail at the bottom step, or hold on to the rail behind. Plaintiff's Exh. 20. Plaintiff testified that as he descended the last steps he ran out of rail to grasp.

Defendants contend that the rail was sufficiently long, and that the proper method to descend a ladder is to hold the rail with one hand in front and one hand trailing behind. Defendants rely on the testimony of Herb Lyons, Director of Loss Control and Human Resources at Dillingham Ship Repair Yard, with a background in marine safety. Mr. Lyons stated that the rail was reasonably fit for its intended purpose. He estimated that ladder rails on 25% of all ships extended all the way down to the deck; 50% extended to the first step; and 25% extended to just above the second step. He also stated that descending with a trailing hand provided greater stability. Similarly, Captain McAlpin stated that the rail was safe, and that a trailing hand descent is recommended.

Doug Kruger, president of the Columbia River Pilots' Association, stated that the rail at issue offered no protection at the bottom steps. He took photographs, at the request of plaintiff, of ladders on all ships in port on the day of the accident. Plaintiff's Exhs. 28–31. A review of those photos shows that most rails extend to the bottom step of the ladder. The only rail similar to the one at issue, stopping slightly over the second to last step, appears at a steeper angle. Plaintiff's Exh. 31. Mr. Kruger stated that he watched the crew on the Africa descend the ladder in question, and they consistently let go of the rail prior to reaching the last step, because the rail was behind them at that point.

Although Mr. Lyons estimated that 25% of all ships have rails which extend only to the second to the last step, he also estimated that 75% of all ships had rails which extended further than the one at issue. Mr. Lyons did not specify the angle at which those similar ladders would be placed. Even accepting Mr. Lyons testimony, the 25% could be those ladders, which are used at a steeper angle, alleviating the need for longer rails.

I find that plaintiff was not reasonably expected to descend the ladder with one hand trailing behind. The seaman who escorted plaintiff did not trail one hand behind, nor did the rest of the crew. Numerous pilots testified that they did not descend a ladder with one hand trailing behind.

I find that the rail on the starboard accommodation ladder is unfit for its intended purpose. That rail did not provide plaintiff with a handhold as he descended from the second step to the last step. The rail is unseaworthy.

Plaintiff submitted two standards which address the proper length of handrails on vessels. Plaintiff's Exh. 11, International Convention on Load Lines, 1966, and Plaintiff's Exh. 59, Pacific Coast Marine Safety Code, 1979. The parties agree those standards are not controlling in this case. Plaintiff offers them as analogous standards. In finding that the handrail is unseaworthy, I do not rely on either of these standards.

## 2. *Accommodation Deck.*

It is uncontested that water was on the accommodation deck. The parties disagree whether oil or some other substance was on the surface of the water. The water was present when plaintiff boarded the Africa and deeper on his return.

Steve Cox, a design engineer, testified that the accommodation deck was unusually designed because it allowed water to collect. He stated that a center drain would alleviate the problem permanently and that planking would have been a temporary solution. He stated that new ships were not usually designed that way.

John Roe, a tug boat captain who arrived at the Africa shortly after the accident to lend assistance, stated that the crew was cleaning up the water on the accommodation deck with rags when he arrived. He also noted that boards were placed over the water to walk to the ladder. He stated that it was raining very hard that morning.

Plaintiff stated that the day before he had been on the ship and the accommodation deck was dry.

■ I find that the water on the accommodation deck does not render the vessel unseaworthy. The deck was normally dry. That morning it rained quite hard. Although new ships are generally not designed this way, some ships are designed this way. There was insufficient evidence to show that the design of this deck was outside the "usual and customary standards of the calling." *See Boudoin*, 348 U.S. at 340, 75 S.Ct. at 385.

■ In a series of events, there may be both unseaworthiness and negligence. *Hydaburg Cooperative Assoc. v. Alaska Steamship Co.*, 404 F.2d 151, 153 (9th Cir. 1968). However, the absence of one does not refute the possibility of the other. *See id.* The water was present when plaintiff arrived. Two hours later the water was still present and deeper. The crew wholly failed to correct the problem, by wiping it up, or putting out planks, until after the accident occurred. Although the temporary presence of water on the deck may not constitute unseaworthiness, the failure to correct the situation after it has arisen, and is known to the crew for hours, is a breach of the duty of care owed to plaintiff.

## 3. *Causation.*

Plaintiff must establish causation for both the negligence and the unseaworthiness claims. *Litherland v. Petrolane Offshore Construction Services, Inc.*, 546 F.2d 129, 132 (5th Cir.1977). Specifically, plaintiff must show that the water on the accommodation deck and the shortness of the handrail were the proximate cause of his injuries. To establish proximate cause, plaintiff must show that "the act or omission played a substantial part in bringing about or actually causing the injury; and that the injury was either the direct result or reasonably probable consequence of the act or omission." *Id.*

■ Defendants contend that there is no proof that the substance in the water was oil, or that a longer handrail would have prevented plaintiff's fall. Although there may not have been scientific proof that the substance in the water was oil, Mr. Cox testified that water alone decreases friction and makes it easier to slip. Moreover, there is substantial evidence that there was something in the water; it was not clean water. Plaintiff testified that the water was so deep it soaked through the zippers of his boots. He stated that he walked through twenty feet of dirty water, which had something in it, perhaps soot, grease, or diesel oil. He testified that he used the rail until he ran out of rail at the last two steps.

I find that the shortness of the handrail, together with the standing dirty water, played a substantial part in bringing about the accident.

## 4. *Damages.*

There is no dispute that plaintiff injured his ankle in the fall. There were differing opinions as to the degree of damage and the possibility of recovery and return to work. Dr. Harry Sirounian, an orthopedic surgeon and an osteopathic surgeon, treated plaintiff, and examined him prior to

trial. He stated that the tibia had healed with some deformity and showed evidence of post-traumatic arthritis. Dr. David Waldron, an orthopedic surgeon who also treated plaintiff, along with Dr. Sirounian, believed plaintiff would be unable to return to work based on the damage to his ankle.

It is undisputed that plaintiff suffers from a thoracic disc protrusion. There was some dispute as to whether the accident caused the condition, or merely focused attention on a previous injury. Plaintiff's treating physicians agreed that the fall caused the disc protrusion. Dr. Joel Seres, a neurosurgeon specializing in pain, stated that it was medically possible that plaintiff's disc herniation occurred prior to his fall, but there was a high degree of probability that the fall caused it. Dr. Seres stated that motivation was the key factor in determining whether plaintiff would return to work. He felt that plaintiff was a highly motivated individual, and with therapy he could overcome his pain and return to work.

At the time of trial, plaintiff was 64 years of age. Plaintiff stated that prior to the accident he had no plans to retire. He intended to work possibly beyond age 70. He had always been healthy. Except for a back injury in 1972, he had never missed a day of work due to ill health.

Dr. Richard Parks, an economist, submitted his report outlining plaintiff's present and future economic losses. Plaintiff's Exh. 17. He stated that plaintiff's economic loss from January 22, 1986 to December 19, 1986 was $72,328. He estimated plaintiff's future losses assuming that plaintiff could not return to work.

■ I find that the fracture to the ankle and the herniation of the thoracic disc were caused by the fall. Both of those injuries have permanent effects. I find that plaintiff is a highly motivated individual. I agree with Dr. Seres that plaintiff's motivation will allow him to regain almost complete functional use of his ankle, and his disc protrusion will not result in substantial disability. I find that plaintiff did sustain economic loss of $72,328 from January 22, 1986 to December 19, 1986. Plaintiff is entitled to recover for his economic loss already sustained, plus $78,903.27 for each of the next two years, plus general damages of $100,000 and medical expenses.

### 5. *Contributory Negligence.*

■ In maritime law, contributory negligence does not bar recovery, but is applied to mitigate damages. *Dubose v. Matson Navigation Co.*, 403 F.2d 875, 877–78 (9th Cir.1968). Plaintiff had previously walked this ladder. Plaintiff should have kept better watch, and should have observed that there was no handrail at the bottom steps. It was raining. Plaintiff should have been more careful in placing his step. Plaintiff was 20% at fault. Damages must be reduced accordingly.

### CONCLUSION

Defendants Compania Maritima De-La-Mancha and M/V Travemar Africa are jointly and severally liable to plaintiff for $72,328 for economic loss already sustained; $78,903.27 for each of the next two years; $100,000.00 general damages; and medical expenses. The total amount shall be reduced by 20%, plus prejudgment interest from January 22, 1986.