## THE ALPIN. (Nine Cases.)

(*District Court, E. D. New York.* December 30, 1884.)[1]

1. STRANDING OF VESSEL—NON-PRODUCTION OF WITNESSES—PRESUMPTION.

    The steam-ship A., while on a voyage from Inagua, Bahama islands, to New York, was stranded on the coast of Maryland. In actions brought on her bills of lading to recover for the loss and damage to cargo resulting, *held*, that the non-production, without sufficient excuse, of any one of the numerous persons who were on board as crew and passengers at the time of the stranding, as witnesses, to explain the circumstances of the stranding, except the chief engineer, who was below at the time, warrants a presumption that, if they had been produced, they would have shown the stranding to have been the result of negligence in the navigation of the ship.

2. SAME—NEGLIGENT NAVIGATION—FAILURE TO SOUND.

    That when it appeared that on January 19th the master supposed himself to be in latitude 36 deg. 40 min., longitude 74 deg. 10 min., and the next day, at 1:25 A. M., was on a bar four miles north of Green Run inlet, the weather being thick, and no explanation was given of the vessel's course meantime, *held*, that if her course was directly between those two points, it was clearly negligence; and that if the master supposed himself on the 19th to be in that latitude and longitude, it was his duty to verify his supposition by sounding; and that the failure of the ship to deliver her cargo was caused by this negligence.

3. LEX LOCI CONTRACTUS.

    Where the *lex loci contractus* is neither pleaded nor proven, it is presumed to be the same as the law of the United States.

4. AVERAGE ADJUSTMENT—ARBITRATION.

    The making of an average statement by average adjusters is not an award by arbitrators.

In Admiralty.

*Scudder & Carter (Lewis Cass Ledyard)* and *Sidney Chubb,* for libelants.

*Wheeler & Souther, (Everett P. Wheeler,)* for claimants.

BENEDICT, J. These actions, tried together, are brought upon bills of lading to recover damages for the failure to deliver, in like good order, at the port of New York, cargo, in the bills of lading mentioned, shipped on board the steam-ship Alpin. On January 15, 1883, the steamer above mentioned, bound for New York, left the port of Inagua, having on board a cargo of assorted merchandise, consisting in large part of coffee and hides. On the morning of January 20, 1883, a few minutes after 1 o'clock, she stranded some four miles north of Green Run inlet, on the coast of Maryland, upon a bar running along about 300 yards from the beach. As soon as the vessel struck, some cargo was thrown overboard, and an effort to work the vessel off the bar by running her engines full speed astern having failed, all on board left her and went on shore. The following night the steamer came in over the bar, and on Sunday morning was lying in an easy position, so high up on the beach that her officers walked to her, and her mails were landed from her into an ox-cart backed up to her side for that purpose. On Monday an agent of the owners arrived and took

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

charge of the steamer and her cargo. The sea continuing smooth, under his direction all the cargo, except about 150 tons, was put over the side and carted up on the beach, and on the 24th the steamer was hauled off the beach by tugs and proceeded to New York. The loss and damage to the cargo amounted to $82,000. The value of the steamer was $48,000.

To recover for the loss and damage to the portion of the cargo owned by the above-named libelants these actions are brought upon their several bills of lading, similar in legal effect. They claim to recover upon two grounds : *First*, that the stranding of the steamer was caused by negligence on the part of those engaged in her navigation; *second*, that after the stranding, unnecessary loss and damage to their merchandise was caused by the neglect and wrongful conduct of the agent of the owners, under whose directions the cargo was taken out of the vessel, after she had grounded on the beach.

By far the greater part of the testimony is directed to the action of this agent in respect to the cargo, and this testimony certainly presents some remarkable facts. But I find it unnecessary to consider that branch of the case to which the testimony referred to applies, for the reason that I am satisfied that it is my duty to hold the vessel liable for the loss and damage sustained by the cargo in question upon the ground that the stranding of the steamer was caused by the negligence of those at the time in control of her navigation.

The condition of the testimony upon this branch of the case is extraordinary. On the voyage in question, and at the time of the stranding, there were on board the steamer, officers and crew, 29 persons, besides two passengers. Of these, the chief engineer, who was below when the vessel stranded, is the only witness called by the claimants; and this, notwithstanding it appears that the captain and the chief officer of the steamer have been in New York, and in communication with the owners since the commencement of these actions. The only excuse offered for this important omission to call these officers to explain their navigation of the steamer is that the libels do not charge that the stranding was caused by negligence, and the claimants were therefore justified in assuming that the circumstances attending the stranding would not be the subject of inquiry, and so allowed the master and crew to depart without taking their testimony. But the claimants knew that the stranding of their vessel was to be their defense; and their course in relying for proof of the stranding upon the admissions in the libels and the testimony of witnesses who, while knowing of the stranding, could not know how it was caused, when the testimony of those who would be the natural witnesses to prove such a defense was at command, indicates the existence of a reason other than that of surprise for the non-production of these witnesses, and warrants a presumption that if the officers of the steamer had been called, they would have shown the stranding to have been the result of negligence in the navigation of the ship.

It is to be also noticed that some of the libels do not admit the stranding, and that the libels in which a stranding is admitted couple the admission with the statement that it arose "from causes to your libelant at present unknown," while the answers deny negligence. Moreover, after the libelants' testimony showing negligence was put in, no application was ever made for time to procure the testimony of the officers of the steamer. Little room is therefore left to contend that the failure to produce any of the crew of the steamer is to be excused on the ground of surprise.

The inquiry in regard to the cause of the stranding opens, therefore, with the presumption that the testimony of the officers of the steamer would show that the stranding was caused by their negligence, in addition to which there are facts proved from which negligence must be inferred without the aid of this presumption. The captain's protest is put in evidence by the libelants, and manifestly contains the entries in the steamer's log-book for several days prior and up to the stranding. The log-book itself, although called for by the libelants, is not produced, but it was conceded that the protest showed the entries in the log on the days mentioned.

From this protest it appears that for several days prior to the stranding the vessel had been run by dead reckoning; that the weather had been thick, and, for some hours before the stranding, so thick that the engines were slowed and the whistles blown; and that at no time was the lead thrown. It is true, the protest does not say that the lead was not thrown, but it omits to state that it was thrown, and this omission, under the circumstances, compels the inference that it was not thrown; and this inference is confirmed by the fact that the chief engineer does not state that his engine was stopped at any time until the stranding.

The protest also shows that on the nineteenth of January the master supposed his position to be, latitude 36 deg. 40 min.; longitude 74 deg. 10 min. It is also evident that some time before the stranding the vessel had passed out of the Gulf Stream. In regard to the course upon which the vessel was sailing when she stranded, or indeed at any other time, there is no testimony. No courses whatever are given by the protest, or stated by the chief engineer. According to the protest, however, on January 19th, the vessel was in latitude 36 deg. 40 min., longitude 74 deg. 10 min., and on the next day at 1 : 25 A. M. she was on a bar four miles north of Green Run inlet. If a line between these two points shows the course of the steamer at the time she ran ashore, a clear case of negligence is made out; for such a course was directly on the land, and to hold such a course in thick weather, without sounding, until the vessel struck, would be gross negligence.

If, then, the inquiry were rested at this point, I know not that the claimant would have cause to complain; for, according to the protest, such was the vessel's course, and no officer of the steamer is called to

say that the steamer was upon a different course, or that she was supposed to be upon a different course, or to say that the location of the vessel on January 19th, as given by the log, is an estimated position, arrived at by dead reckoning, and not the actual position of the vessel on that day.

But, giving to the claimant the benefit of a presumption that the master would not knowingly put his vessel upon such a course, and considering the statements of the protest in regard to the weather, coupled with the evidence as to where the steamer actually struck the shore, to be sufficient to warrant a conclusion that the vessel was sailing by dead reckoning, and that the location of the vessel on the 19th, as given by the log, represents no more than a mistaken conclusion of the master that such was his position, when, in fact, he was close in upon the coast; still it must be held that the cause of the stranding was the omission to throw the lead, and that such an omission, under the circumstances, was negligence. For if the master, on the 19th, supposed himself to be in the locality stated in his protest, and knew, as he must be presumed to have known, that he had already crossed the Gulf Stream, when on the afternoon of the 19th the weather grew so thick as to make it prudent to slow the engines and blow his whistle, it became the duty of the master to verify his supposition as to his location by sounding. He knew land was under his lee. He knew that the wind, as it was, would carry him towards the land. He also knew, or ought to have known, that he might be under the influence of a current running towards the land. Moreover, the weather was thick, and he knew that he did not know his position, and that an approach to the land would be indicated by the soundings. Under such circumstances common prudence required him to sound. Had he observed this common and, under the circumstances, necessary precaution, the lead would have informed him that he had been mistaken as to his position, and was sailing close to the lee shore; and with this knowledge he could have prevented the accident that shortly occurred.

It is said that the master was not bound to sound because he had passed Hatteras 50 miles off, and on that course soundings would be useless. If it be conceded that the steamer in fact passed Hatteras 50 miles off, it is not seen how the vessel could have stranded where she did without a negligent change of course. But the truth is that the steamer did not pass Hatteras at a distance of 50 miles, and instead of being well off shore was sailing so close that the wind and sea carried her sufficiently to leeward to bring her on the bar, the question, therefore, is not whether the master supposed, from his dead reckoning, that he was at a safe distance from the land, but whether he was justified in proceeding, in thick weather, upon that supposition alone, with means at hand to test the accuracy of his supposition. I think he was not justified, and was guilty of negligence in so doing.

It is suggested that the master may have been misled in regard

to his position by a deviation of his compass. There is proof that no ordinary deviation of the compass will account for the stranding, and there is no evidence of any deviation whatever. If there was a deviation of the compass, it would have been easy to prove it; and if the master's reliance upon his compass was the cause of the stranding, that too might have been easily proved. Surely such things cannot be presumed in the absence of the master's testimony.

The conclusion I have now stated is supported by the opinion of several master mariners of large experience on this coast, who concur in saying that it was negligence in this master not to use his lead under the circumstances stated in his protest. My determination upon this branch of the case, therefore, is that the failure of the claimants to deliver the libelants' goods was caused by negligence on the part of those navigating the steamer.

I pass now to consider the position taken by the claimants that the libelants cannot recover the damage resulting from this negligence, because liability arising from the negligence of the captain, or the agent of the owner, is excepted by the terms of the bill of lading, and that this exception is valid according to the law of the place where the contracts were made. The answer to this position, sufficient for this case, is that the *lex loci contractus* is neither pleaded nor proven; and the presumption is that it is the same as the law of the United States, which is adverse to the validity of such an exception in bills of lading.

Lastly is to be noticed the contention of the claimants that the action of the average adjusters in making up an average statement, pursuant to average bonds executed by the libelants, was an award made upon a submission to arbitrators, and finally determined the present controversy. This contention is based upon what appears to me to be a novel idea respecting the effect of an average bond. No case is cited where an average bond has been treated as a submission to arbitration, and the adjustment as the award of arbitrators; nor am I able to discover any reason for giving such an effect to these commercial acts. Average bonds and average adjustments are not new, and it is late now to discover that the adjustment by average adjusters is an award by arbitrators pursuant to a submission to arbitrators, and conclusive as such upon all who have signed the average bond. In my opinion, such a view of the transaction is wholly untenable. It would seem to be contrary to the decision of the supreme court in the case of *The Niagara*, 21 How. 9, in which the answer set up "an agreement not only to share the damage, but that the goods should be charged with, and pay their proportion of, a general average of the losses thus occasioned."

The views I have already expressed render it unnecessary to consider the interesting question whether the method pursued in lightening this vessel when on the beach, resulting, as it did, in a loss of cargo nearly double the total value of the vessel, was justified by the

surrounding circumstances. Upon that question, therefore, I intimate no opinion, but rest my determination upon the ground that the stranding of the vessel was caused by negligence on the part of those in charge of the vessel at the time.

Let decrees be entered in favor of the various libelants, with an order of reference to ascertain the amount.

---

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.