BUNGE CORPORATION, Moinho Fluminense S. A. Seccao Moinho Central, Moinho Fanucchi Cia, Brasileira De Moagem, Moinho Da Bahia S. A., Moinho Paulista, Ltda., Moinho Paranaense, Ltda., S. A., Moinho Santitsta Industrias Gerais, Libelants,

v.

ALCOA STEAMSHIP COMPANY, Inc., and Oceanic Transport Corporation, Respondents.

BUNGE CORPORATION, Moinho Fluminense S. A. Seccao Moinho Central, Moinho Fanucchi Cia, Brasileira De Moagem, Moinho Da Bahia S. A., Moinho Paulsita, Ltda., Moinho Paranaense, Ltda., S. A. Moinho Santitsta Industrias Gerais, Libelants,

v.

The GENERAL ARTIGAS, HER ENGINES, ETC., Oceanic Transport Corporation, Claimant-Respondent.

United States District Court
S. D. New York.
March 10, 1955.

Hill, Rivkings, Middleton, Louis & Warburton, New York City, for libelant by Arthur O. Louis, J. Edwin Carey, New York City, of counsel.

McNutt & Nash, New York City, for claimants-respondents by James E. Freehill, Thorolv T. Waaland, New York City, of counsel.

GODDARD, District Judge.

These actions were consolidated for the purpose of trial.

Libelants, as owners, shippers and consignees of a cargo of wheat shipped aboard the S. S. General Artigas, sue the ship, her owner, and her charterer for damage to a portion of the shipment.

On November 24, 1951, libelants, at New Orleans, delivered the wheat in good condition to the General Artigas for transportation to Salvador and Santos, Brazil. Part of the wheat was discharged at Salvador on December 16th to the 18th, the balance at Santos, December 28th to January 9th. On January 3, 1952, some of the wheat from No. 5 hold was discovered to be in a damaged condition, charred and blackened.

The contract of carriage incorporated the provisions of the Carriage of Goods by Sea Act, Title 46 U.S.C.A. §§ 1300–1315.

Libelants charge that the damage was caused by sea and rain water entering into the hold through uncovered ventilators and that the carrier is liable for improper care and custody of the cargo. 46 U.S.C.A. § 1303(2); Andean Trading Co. v. Pacific Steam Nav. Co., 2 Cir., 263 F. 559; The Jean Bart, D.C., 197 F. 1002; The S.S. Austurias, D.C., 40 F. Supp. 168, affirmed Wessels v. The Asturias, 2 Cir., 126 F.2d 999. Respondents admit the damage to the wheat but contend that the cause of damage was steam from the steam smothering line in the hold, the valve having been inadvertently opened, and that turning on the steam was an error in the management of the ship for which they are not liable. 46 U.S.C.A. § 1304(2) (a); The Newport, D.C., 3 F.2d 1017, reversed on other grounds, 9 Cir., 7 F.2d 452.

The S.S. General Artigas is a Canadian Liberty type vessel, 416 feet in length, 56 feet and 10½ inches wide, and 37 feet and 4 inches deep.

The ship's five lower holds and tween decks were stowed with 9,975 tons of wheat, all in bulk, except 450 tons in

bags, of which 61 tons, about 2,000 bags were stowed in the after part of No. 5 tween deck. Also in the tween deck, forward part, 263 tons of the bulk wheat were stored in bins, while the lower hold contained 1,407 tons of the bulk wheat.

No. 5 hold is 60 feet long, 50 feet wide at the forward end, 40 feet at the after end, and 28 feet deep from tween deck to tank tops. The hatch, beginning 20 feet from the after end of the hold, is 35 feet long and 20 feet wide, 10 feet on either side of the hold's center line. A center line longitudinal bulkhead extends out from the after end of the lower hold 20 feet, terminating at the after end of the hatch coaming.

There are four cowl-type ventilators, trunks about 2 feet in diameter, cowls about 3 feet, serving the after end of No. 5 hold, two to the tween deck and two to the lower hold, starboard and port. The openings of the ventilators in the top of No. 5 lower hold are 6½ feet aft of the after end of the hatch or 13½ feet forward of the after end of the hold, and about 12 feet out from the center line longitudinal bulkhead, or about 8 feet from either side of the hold.

From the engine room there are two steam lines to the weather deck aft of No. 5 hold; one furnishes steam for the mooring winch, the other is a smothering line to provide steam for No. 5 hold in case of fire. Both lines are controlled by valves about 7 feet apart on the weather deck. The valve on the line for the winch is generally open and the one to the No. 5 hold is closed except in the event of an emergency.

The steam smothering line is 2 inches in diameter and runs into No. 5 hold on the side of the center line bulkhead, a little more than 20 feet from the sides of the hold and about 1 foot aft of the hatch opening, after end, with an opening or outlet facing downward in the lower hold and no outlet in the tween deck. The outlet is 19 feet from the top of the lower hold, or 9 feet from the bottom. The outlet was in and surrounded by wheat.

The respondents' proof that the valve of the smothering line had been opened consists of the deposition of Ioannis Moustaka, the boatswain, a Greek, unemployed at the time of the trial, who testified that when the ship was all tied up at Salvador in the afternoon, as he went aft to obtain a ladder, he noticed that some steam was coming from the valve and that it was open; that he turned it off and reported it at once to the chief officer; and that he did not know how long it had been opened or by whom. Also the testimony of Foutoulakis, the first officer on the Artigas, who is still employed by the same owner but on another ship, and who testified in person that about an hour before they docked at Salvador on December 16th at 6:26 a. m., in preparing for unloading, he received word that the steam smothering line in No. 5 hold had been found open; that he went aft to look at it. It was then closed but a small wire on it had been broken and that from the condition of the packing and paint he could tell that it had been opened. He did not mention the open valve in his log book, nor did he tell the surveyors about the open valve when they came aboard on January 3rd at Santos. When confronted with the fact that no mention of that had been made by him in his log, he admitted that it was his duty to do so, but said that the master told him not to, and he obeyed the master's orders.

He was not a convincing witness, and I can give little weight to his testimony. It may be noted that Moustaka testified that it was in the afternoon after the ship had docked and that the first officer said that it was about an hour before 6:26 a. m. preparatory to docking that this occurred.

S. Spathis, master of the General Artigas, testified that the first time he heard about any valve being open was in July, 1952, which refutes the testimony of Foutoulakis, the first officer, who said that the master had told him not to

mention the open valve in the log. The ship's smooth log written by the master, on January 3, 1952, when the damage to the wheat was discovered, states "In my opinion the cause is that cargo became overheated out of warm weather and from the rough and boisterous weather we have experienced during the voyage" and includes a recommendation that Lloyd's agent appoint a surveyor in behalf of the vessel. On January 9th, after talking with Captain Scullard, who had completed a five day survey, the master added to the entry of January 3rd "probably some sea water passed down the hold." In his deposition, in answer to the question—"Is it your opinion that steam coming through that outlet [of the smothering line] in No. 5 hold might have caused this damage?", he said "Yes". He also testified, "always the ventilators were covered when there is rough weather; but probably, by mistake, by delaying to cover them five minutes or ten minutes, probably water went down."

Dr. Antonio Navarro de Andrade, Agricultural Engineer, Ministry of Agriculture, government of Brazil, testified by deposition as follows: He was called in to survey the cargo by F. S. Hampshire & Co., Lloyds' agents in Santos. He went down to the ship on the 3rd of January and observed the condition of the wheat every day from the 3rd to the 9th while it was being discharged. The location of the damaged wheat was "in the central part of the after-third of the ship, No. 5 hold." The wheat was black from a few centimeters under the floor of the tween deck under a layer of good wheat, had a strong smell of burn and was very hot, 185° F., and compact. Under the black wheat there was a layer of very damp and fermented wheat giving off a bad smell due to fermentation. The damp wheat began to appear at about where the escape valve of the steam line was. The wheat was not black on the bottom and its temperature was normal. Samples of the wheat were taken and a chemical analysis was negative in testing for salt.

It was his opinion that the cause of the damage was the entry of water coming through the ventilators and that the steam could not have caused the damage, "not the way I found the wheat." "If the steam came directly over the wheat the effect would not have been dampness but only burn and heat." Steam vapor condenses to water but it needs a free space because the heat in contact with the wheat would burn it.

In his survey report, made January 19, 1951, Dr. Andrade noted that in No. 5 tween deck, after part, about 500 bags of grain showed definite signs of damage and all the bags in contact with the roof of the hold showed signs of excess humidity. The few centimeters of wheat between the roof and the black wheat were described as "malt of wheat beginning to turn to caramel, that is, having passed the malt stage, transforming partly into a maltose, which, upon combined action of heat begins to melt, changing color and forming, in consequence, caramel. [The 'caramel' portion constituted a small percentage of the blackened wheat] * * *. The determining cause of 'malting' roasting and turning to 'caramel', was, indisputably heat generated by fermentation and other chemical actions." The damp wheat below the blackened wheat was about 1½ meters thick "whilst above it a layer adhered to the sides of the hold, diminishing in thickness until reaching the ventilators."

Captain Rodney B. Scullard, testified by deposition as follows: He is Marine Superintendent for the Blue Star Line and holds a British master mariner's license. He also was called in to survey the damage by F. S. Hampshire, Lloyds' agent in Santos. He went down to No. 5 lower hold after discharge of damaged cargo commenced and he found the plates on the ship's side and on the tunnel recess discolored, wet and wheat caked to the plates. The damaged cargo was located "right on the square of the hatch" when he first saw it and the damage extended from the side of the ship "but it was more to the center of the square leading out toward the wings", part of

it reached the side plating. It minimized as discharge progressed. At the time he conducted the survey it was his opinion that the wheat was damaged by water which entered by the ventilators and that was still his opinion but it is possible that the damage was caused by steam.

Scullard stated that the water "had probably caused spontaneous heat, which caked and discolored this grain."

Alexandre Semple, production manager in the mills of libelant Moinho Santista, testified by deposition that the black wheat appeared three or four feet below the level of some good wheat, and that the bagged wheat was in a rotten condition. The laboratory under his charge made an analysis of a sample to determine salt content and the result was negative.

Teodors Kalve called in by Moinho Santista to take a sample of the damaged wheat, testified by deposition that the black wheat appeared beneath a layer of about one foot of sound wheat. There was also wheat in bags on the tween deck which was damaged.

The master reported that the damage "starts from the hatch coaming of the lower hold and goes down, covering a surface of about 600 square feet, from the after end of the lower hold and goes forward about 40 feet in length." He testified also that the damage was 5 or 10 feet from the longitudinal bulkhead.

Dr. Lauro, chemical engineer, Chief Chemist for the New York Produce Exchange, a graduate of Yale, with forty years experience, testified that he analyzed samples of the wheat first by the conventional test, rinsing the material and testing the rinse water. This gave a negative result for salt water. Realizing that the wheat might have absorbed salt water, he cracked the wheat, soaked it in water and ran a test on that. The result indicated .0035 per cent salt in about 450,000 kilograms of wheat. The smallness of the salt is in relationship to the bulk of the wheat. Wheat contains inherent quantities of sodium and chloride but not combined to form the compound sodium chloride, or common salt. If salt were part of the characteristic of wheat he could not have extracted it with the kind of test he ran. The salt must have come from the outside. In his opinion the wheat had been wet by salt or sea water.

He thought that the wheat on top of the hold might have appeared to be sound, but though not chemically degraded it might in fact be damaged in the sense that it would be water-damaged. The upper layer would be absorbed in water forming a gelatinous mass that prevents the dissipation of the heat generated by fermentation beneath. The heat thus becoming excessive would char and burn the wheat below the top layer. Also, damaged wheat in the process of fermentation can transmit itself to other wheat that has not initially been damaged. It was his opinion that the temperature of steam was not great enough to cause the burning of wheat and that steam vapor would not rise through the wheat unless under terrific pressure and going for hours, and that the excessive heat necessary to cause burning could only have been generated in the process of fermentation.

Although the first officer said the weather was "very nice" from New Orleans to Salvador, the smooth log, which bears the signature of the first officer on each page, contains the following entries:

"Nov. 30—owing to warm weather, ventilators uncovered for the cargo to be ventilated

Dec. 1—overcast, showers at times

Dec. 2—shipping seas all over decks and hatches

Dec. 5—ventilators uncovered to air the cargo owing to warm weather * * * showers at times

Dec. 14—overcast, rain at times * * * rough sea * * * shipping seas on decks and hatches * * * overcast and showers * * * weather is getting worse * * * Decks are flooded."

The log also shows they were shipping seas on December 3, 8, 11 and 12.

Since no witness saw water entering the ventilators or how long or to what extent the valve may have been open, the cause or causes of the damage can only be inferred from the location and nature of damage, conditions of the weather and ventilators, and other circumstances.

Counsel for respondents rely heavily on the testimony that there was a layer of good wheat above the blackened wheat. The thickness of this layer varied, according to the witness, from a few centimeters to five to six feet. If the water came through the ventilators onto the top of the stow the damaged wheat should have appeared at the very top, contend the respondents. But one of the witnesses, Dr. de Andrade, although referring to the top layer as "good wheat" also described it as "malt of wheat beginning to turn to caramel" due to fermentation. Apparently the wheat on top was damaged though not charred like that underneath. Also Dr. Lauro explained that it would be possible for the top layer to absorb moisture and still give the appearance of being in sound condition. It seems reasonable to believe that the wheat on top of the stow had begun to ferment, like the wheat underneath, but having air above it, the heat that was generated could dissipate, and this wheat, in consequence, did not burn, unlike the lower layers of wheat which, due to the blanket of wet wheat above, could not dissipate the heat and therefore became burned and charred.

The nature and location of the damage seem to be more consistent with the theory of water coming from the ventilators than through the steam pipe.

Even if the damage commenced 5 feet below the tween deck, there were 14 feet down to the opening of the steam pipe, which was 2 inches in diameter and faces downward. Moreover, the evidence establishes that below the black wheat was lighter color wheat, and the point at which the black wheat stopped was above the opening of the steam pipe. Also the damage extended out to the sides of the ship and covered an area of 600 square feet, and the wheat underneath the dark, hot wheat was wet and normal in temperature. If the steam had been turned on for any length of time it would seem that either the burning would have been most severe on the very bottom of the hold [on Dr. de Andrade's theory] or no burning would have occurred at all, but only wetness and humidity [on Dr. Lauro's theory]. If there were only steam and no water from the top, the damage would not have extended so high or as far as it actually did, since the steam vapor would have condensed or been absorbed by wheat before reaching 14 feet above the opening and 20 feet out to the side, nor does it seem likely that the temperature of wheat would have been normal on bottom underneath the opening and hot on top, above the opening, when the damage was discovered.

On the other hand, the evidence shows that the damage appeared in the general area of the ventilator openings. The water entering through the ventilators very likely set up the process of fermentation which, covered by a layer of wet wheat, spread to other portions of the underlying wheat and thus created damage over a broad area. Also, there is no satisfactory explanation of how wheat on the tweendeck could have been damaged except by water from above, although respondents suggest that the "humidity created by the entry of steam and the warm air would rise through the wheat into the tweendeck above."

None of the experts have testified that the damage *was* caused by steam. Captain Frame, called by respondents, and Spathis, the master, said that it *might* have been caused by steam. [Emphasis added.]

Captain Scullard, respondents' own expert, said that "I am still of the opinion that the water came through the cowl ventilators." Dr. Andrade testified that it was his opinion that the damage was caused by water from the ventilators. Dr. Lauro—that it was caused by water

from the ventilators and he ruled out the suggestion that it could have been caused by steam.

It is well settled that under the Carriage of Goods by Sea Act §§ 3, 4, 46 U.S.C.A. §§ 1303, 1304, if the shipper proves his goods were loaded in good condition and outturned damaged, the carrier, to avoid liability, must prove that harm resulted from an "excepted cause" for which the carrier is not liable or that it exercised due diligence to avoid and prevent harm. Schroeder Bros. v. The Saturnia, D.C., 123 F.Supp. 282; Union Carbide & Carbon Corp. v. The Walter Raleigh, D.C., 109 F.Supp. 781, affirmed 2 Cir., 200 F.2d 908; J. C. Penney Co. v. The American Express Co., D.C., 102 F.Supp. 742, affirmed 2 Cir., 201 F.2d 846; General Foods Corporation v. The Troubador, D.C., 98 F.Supp. 207.

Respondents have not proved by a preponderance of the evidence that the damage resulted from an excepted cause.

Assuming that the valve of the smothering line to the No. 5 hold was found open, there is no proof of when, by whom, or how long it was open or how much steam escaped. I am convinced that at least a major portion of the damage was caused by water entering the hold through the ventilators. When damage to cargo may be the result of two concurring causes, the burden is on the carrier to prove what damage was attributable to causes excepted under the Carriage of Goods by Sea Act. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Union Carbide & Carbon Corp. v. The Walter Raleigh, supra; Sanib Corp. v. United Fruit Co., D.C., 74 F.Supp. 64; cf. The Patria, D.C., 125 F. 425, affirmed 2 Cir., 132 F. 971; Mary Luckenbach, 1940 A.M.C. 1582.

The respondents have not sustained this burden and the libelants may have a decree for the damages sustained with a reference to a Commissioner to compute the damages.

Proposed findings of fact and conclusions of law to be submitted promptly upon five days notice.