**TRANS-AMAZONICA IQUITOS, S. A.,**
**Plaintiff,**

v.

**GEORGIA STEAMSHIP COMPANY**
**and Georgia-Pacific Corporation,**
**Defendants.**

Civ. A. No. 2411.

United States District Court,
S. D. Georgia,
Savannah Division.

Nov. 15, 1971.

Supplemental Order Nov. 24, 1971.

Edward T. Brennan, Adams, Adams, Brennan & Gardner, Savannah, Ga., for Trans-Amazonica Iquitos, S. A.

Frank S. Cheatham, Jr., Savannah, Ga., for Georgia Steamship Co.

Walter C. Hartridge, II, Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., John T. Kochendorfer, Bigham, Englar, Jones & Houston, New York City, for Georgia-Pacific Corp.

## ORDER

LAWRENCE, Chief Judge.

In October, 1968, the *Island Sun,* bound to Savannah from Trinidad, grounded on a coral reef about a mile and a half east of Cat Island in the Bahamas. She is a constructive total loss. The vessel carried a cargo of lumber. Georgia-Pacific Corporation was consignee of the shipment.

■ Trans-Amazonica Iquitos had time-chartered the freighter from her owner. It brought suit against Georgia-Pacific and Georgia Steamship Company for the charter hire. The latter is a wholly-owned subsidiary of Georgia-Pacific.[1] It sub-chartered the *Island Sun* from Trans-Amazonica for the voyage to Savannah.

The action for the hire was subsequently settled. We are concerned here with the counterclaim of Georgia-Pacific against Georgia Steamship Company and Trans-Amazonica for the value of the cargo of hardwood lumber which was badly damaged by salt water.

■ Georgia Steamship Company contends that it was neither owner, operator, demise charterer, time charterer or substitute carrier of the *Island Sun* and that there was no privity between it and Georgia-Pacific upon which to predicate liability under the Carriage of Goods by Sea Act. I do not see how it can be maintained that the subsidiary did not occupy a carrier status *vis-a-vis* the parent cor-

poration. Bills of lading were issued on its printed form to Georgia-Pacific. They recite: "RECEIVED by GEORGIA STEAMSHIP CORPORATION, hereinafter called the carrier, from the shipper hereinafter named, the goods or packages  . . ." The fact that Trans-Amazonica was to furnish the master and crew and was in control of the vessel does not relieve Georgia Steamship Company of its contractual obligations as carrier.

Georgia Steamship Company's main defense at the trial was the clause of the Carriage of Goods by Sea Act which says that neither the carrier nor the ship shall be responsible for loss or damage arising by the neglect or default of the master or servants of the carrier "in the navigation or in the management of the ship." 46 U.S.C.A. § 1304(2)(a).[2] The evidence focused on whether the *Island Sun* ran aground as a result of the selection by the master of an unsafe course past Cat Island. Georgia Steamship Company claims that it is exempt because of faulty navigation by her master. Trans-Amazonica adopts the same line. Georgia-Pacific maintains that the evidence does not show negligent navigation but, on the contrary, sustains the theory that the *Island Sun* drifted on the reef after power failure.

■ To recover for damages to cargo the shipper or consignee need prove no more than that the goods were received by the carrier and were not delivered. Georgia-Pacific produced the bills of lading and proved non-delivery. This established a *prima facie* case for recovery and shifted to the carrier the burden of proving that the shipment was lost through some cause for which it is exempted from

1. Ordinarily, corporations are to be treated as separate entities even though the parent corporation owns all of the stock in the subsidiary. Chilean Nitrate Sales Corp. v. The Nortuna, D.C., 128 F.Supp. 938. In the present case there is no issue concerning separate corporate identity.

2. The bills of lading incorporated the terms of the Act by reference. The statutory exemption was carried over, with

some change, from the Harter Act of 1893. The exemption in cases of negligent navigation had been disallowed by admiralty courts in the United States prior to the Harter Act. Similar provisions in bills of lading were upheld by the admiralty courts in England and American shipowners and carriers were thereby disadvantaged. See 48 Am.Jur. Shipping § 447; Gilmore and Black, The Law of Admiralty (1957), p. 122.

liability. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Edmond Weil, Inc. v. American West African Line, 2 Cir., 147 F.2d 363; Bunge Corp. v. Alcoa S. S. Co., D.C., 133 F.Supp. 311; Daido Line v. Thomas P. Gonzalez Corp., 9 Cir., 299 F.2d 669; Dods Shipping Limited of Nassau v. Karobi Lumber Company, 5 Cir., 397 F.2d 570; Schroeder Bros., Inc. et al. v. The Saturnia and Italia Societa Anonima Di Navigazione, 2 Cir., 226 F.2d 147; Interstate Steel Corp. v. S. S. "Crystal Gem", D.C., 317 F.Supp. 112.

Burden of proof is of crucial significance since we are left to surmise and speculation as to what happened to the *Island Sun*. After she stranded, the crew was taken to Nassau. The owner, Avgi Shipping Company, would not allow them to discuss the matter. From the Bahamas, the master and seamen evaporated into thin air as far as this case is concerned. For aught I know, these seafaring Greeks have voyaged to the nethermost reaches of the river Lethe upon whose banks they drink the waters of forgetfulness about the events near Cat Island on or about October 3, 1968. They have left us with a mystery of the sea somewhat reminiscent of the brigantine *Mary Celeste* which was found in the Atlantic off Spain in 1872 abandoned by a crew which was never seen or heard from again.

At the conclusion of the trial I held the case open in order to ascertain whether the *Island Sun* sent out any distress signals and whether the Bahamian equivalent of the coast guard made any investigation or report as to her stranding. I am informed that there is no evidence of radio signals nor an official investigation. I also gave Georgia-Pacific the opportunity to depose a resident of Cat Island who apparently saw the vessel go on the reef. However, nothing developed along that line. In trying to solve this maritime mystery I have only circumstantial evidence and opinions.

Emanuel Perera, an employee of Georgia Steamship Company, is master of a vessel plying between Savannah and South America. He testified that the direct and safest course from Trinidad is through Mona Passage to about latitude 20 and thence on a direct course to Savannah. This carries a vessel 120 to 135 miles east of Cat Island. Captain Perera said that the *Island Sun* was far off her proper course. Another witness for Georgia Steamship Company was John W. Bachrach, a marine surveyor who holds a master's license. He testified that a prudent course would have taken the vessel about 120 miles east of Cat Island.

Thomas Newman who was a witness for Georgia-Pacific was formerly master of a vessel and had sailed these waters for twenty years. He testified that he had navigated five to ten miles east of Cat Island which is a prudent course depending on the weather. Three to five miles out the depth is 25 to 30 fathoms. At that point, it drops precipitately to 2,000 to 2,500 fathoms. The *Island Sun* is 217 feet in length and has a draft of about 14 feet. Mr. Newman who is now a marine surveyor surveyed the *Island Sun* after she stranded. He concluded that there had been a loss of power and that the vessel had drifted in sideways on her port side. He deduced this from tracks left by the ship in scraping along the coral heads. She was facing southwesterly. Her two bow anchors were out and were in vertical position, indicating that they were lowered after the freighter ran aground. The current sets westward in this area at a speed of nearly ½ knot. The compass was in good order. The *Island Sun* was equipped with radar and a radio-direction finding apparatus. There is no evidence as to the time of day she stranded. Cat Island is a conspicuous landmark because of its hilly terrain.

Trans-Amazonica was in far better position than Georgia-Pacific to ascertain and explain what happened off Cat Island. It is the carrier's burden to explain the loss of the goods. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373. "It is almost impossible for the shipper to prove that the carrier was negligent or lacked due diligence because

as a practical matter all evidence on those issues is in the carrier's hands." Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer, 2 Cir., 422 F.2d 7, 16. Failure to produce an important witness in an admiralty case may raise an inference that his testimony would have been unfavorable to a party by whom he should have been called. O. F. Shearer & Sons v. Cincinnati Marine Service, Inc., 2 Cir., 279 F.2d 68; The Alpin, D.C., 23 F. 815. I must conclude that had explanation been forthcoming it would not have been helpful to Georgia Steamship Company and Trans-Amazonica. They have failed to carry the burden of proving that the exemption as to navigational error relieves them.

Since the trial they appear to have shifted the emphasis of their defense away from the navigation exemption. They continue to rely on such exception but now there is more concentration on that part of COGSA which says that "Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy * * *." 46 U.S.C.A. § 1304(1).

Georgia Steamship Company and Trans-Amazonica argue that "seaworthiness" speaks of the time of sailing and not afterward and that the obligation to exercise "due diligence" exists only before and at the beginning of the voyage. Poor on Charter Parties and Ocean Bills of Lading, § 65, p. 166; 46 U.S.C.A. § 1304(1); Isbrandtsen Co. v. Federal Ins. Co. et al., D.C., 113 F.Supp. 357. They argue that the burden is on Georgia-Pacific to show that the Island Sun was unseaworthy when she left Port of Spain and that such condition was the precipitating cause of her stranding. Since nothing in the way of evidence to that effect was produced by Georgia-Pacific it is contended that no burden ever arose on the part of Georgia Steamship Company (or Trans-Amazonica) to prove the exercise of due diligence to make the vessel seaworthy.

There are at least two troubles with this argument. First, there is no satisfactory evidence that the Island Sun was seaworthy when she sailed from Trinidad, a fact which was up to the carrier and owner to establish. Further, I disagree with the contention as to where the burden of proof lies in respect to showing diligence. It is not on the cargo owner. Both the statute and case law make it clear that the persons claiming exemption must prove exercise of diligence. "The carrier shall be bound, before and at the beginning of the voyage to exercise due diligence to—(a) Make the ship seaworthy." 46 U.S.C.A. § 1303 (1). "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section." 46 U.S.C.A. § 1304(1). See Horn v. Cia De Navegacion Fruco, S.A., 5 Cir., 404 F.2d 422; Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 5 Cir., 316 F.2d 163.

Unexplained disaster to a vessel may raise an inference of unseaworthiness where there are no abnormal conditions at sea or known cause of the loss. The Jungshoved, 2 Cir., 290 F. 733; Commercial Molasses Corp. v. New York Tank Barge Corp., supra; Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co., et al., D.C., 162 F. 912; Savannah Lighterage & Transfer Co. v. Atlantic Creosoting Co., 5 Cir., 157 F.2d 796; Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, 2 Cir., 388 F.2d 434; South, Inc. v. Moran Towing and Transportation Co., 2 Cir., 360 F.2d 1002; Martin & Robertson, Ltd. v. The Steamship Barcelona, 1968 AMC 331 (S.D.Fla., 1968); Interstate Steel Corp. v. S. S. "Crystal Gem", supra; In Re Marine Sulphur Transport Corp., D.C., 312 F.Supp. 1081, 1098; 80 C.J.S. Shipping § 154, p. 1041f.

A finding of unseaworthiness might also be justified in that engine trouble developed which could not be corrected on the spot and in a short time with available materials. See Middleton & Co.,

(Canada), Limited v. Ocean Dominion S. S. Corporation, 2 Cir., 137 F.2d 619; Union Carbide & Carbon Corp. v. The Walter Raleigh, D.C., 109 F.Supp. 781, 794, affirmed 2 Cir., 200 F.2d 908.

But to presume unseaworthiness of the *Island Sun* either on departure or enroute to Savannah leads nowhere as far as Trans-Amazonica or Georgia Steamship Company are concerned. They have made no showing as to exercise of due diligence to make her seaworthy. Here again they have presented the Court with a silent record where the evidence should speak plainly and convincingly.

■ I find that the carrier, Georgia Steamship Company, is liable to Georgia-Pacific for the value of the cargo.

Is Trans-Amazonica liable? Paragraph 9 of the charter party between it and Avgi provided that the owner was to maintain the vessel in an efficient state as to hull and machinery. The charterer was to furnish the master with all instructions and sailing directions and he was to be under its orders. As noted above, the vessel was subsequently subchartered to Georgia Steamship Company. The master of the *Island Sun* signed bills of lading for the shipments of lumber. This is a significant factor in determining whether Trans-Amazonica is liable to the cargo owner for the loss.

■ Where a ship is chartered but not demised and the master issued bills of lading "the contract evidenced thereby is not only the ship's contract, and that of the time or other charterer who caused their issue, but that of the owner, whose master (i.e., authorized agent) issued the same. Therefore in this instance the shippers had, beyond the obligation of the ship, the right to look to all three respondents, and hold any or all of them personally liable for right fulfillment of the bills." Gans S. S. Line v. Wilhelmsen, et al. The Themis, 2 Cir., 275 F. 254. In The Capitaine Faure, 2 Cir., 10 F.2d 950, 962, it was said: "It is certain that the charter party was not a demise. The captain, officers, and crew were not appointed by the charterers, but named by

the owners, and through them the owners were in possession of the vessel and responsible for her navigation." A district court has recently ruled that "The contract evidenced by the bill of lading issued by the master of the ship chartered but not demised is the contract of the ship, the charterer who caused their issue, and that of the owner whose master as authorized agent issued them. * * *" Aljassim v. S. S. South Star, D.C., 323 F.Supp. 918, 922. See also The Balosaro, 1935 AMC 1481; Venezuelan Meat Export Co., Limited v. United States, D.C., 12 F.Supp. 379. Carver, Carriage of Goods by Sea (11th Ed. 1963), par. 57; 80 C.J.S. Shipping § 112, p. 906f.

■ Under the sub-charter of July 19, 1968, Trans-Amazonica agreed to furnish vessel, crew and fuel for the voyage. While Georgia Steamship Company was sub-charterer and was described in the bills of lading as "carrier" it had little to do with the *Island Sun* other than engaging her for the particular voyage and paying the charter hire. The agreement between Avgi and Trans-Amazonica conferred upon the charterer the right of "subletting the vessel, giving due notice to the Owners." To create a demise the owner must completely and exclusively relinquish possession, command and navigation of the ship to the demisee. Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205; Klishewich v. Mediterranean Agencies, Inc., D.C., 302 F.Supp. 712, 713; B. W. King, Inc. v. Consolidated Iron & Metal Company, Inc., D.C., 310 F.Supp. 471, 474.

In the charter party between Trans-Amazonica and Georgia Steamship Company the former is described as "Disponent Owners." I have not been able to find any definition of the term. In Scrutton, Charterparties and Bills of Lading (14th ed., 1939), p. 4, it is said that if a man contracts as owner to provide a ship, he cannot furnish one that he has chartered. The author adds: "A common alternative form is to contract as . . . 'chartered owner' or 'Disponent' in which case chartered ships may or

must be furnished." As used in the present case the term in question is the equivalent of bareboat charterer, that is, one who has the right to direct the employment of the vessel. *Cf.* Chilean Nitrate Sales Corp. v. The Nortuna, D.C., 128 F.Supp. 938. There was no demise to Georgia Steamship Company. Trans-Amazonica is jointly and severally liable for the loss of the cargo.

There is no controversy as to the value of the lumber. The shipments were received aboard the vessel in apparent good order and condition. The measure of damage is the value of the cargo at destination. Georgia-Pacific offered testimony as to the "landed value" of the lumber had it been delivered at Savannah. There is no evidence to refute the claim that the market value thereof was $45,061.00 less salvage of $1810.00. Judgment is therefore rendered against Georgia Steamship Company and Trans-Amazonica, jointly and severally, in the sum of $44,251.00. Interest is awardable from the time of the presumptive date of delivery. American Smelting & Refining Co. et al. v. Black Diamond Steamship Corp., D.C., 188 F.Supp. 790; 80 C.J.S. Shipping § 158.

At the trial those two parties established a common front in claiming absolution from liability by reason of the COGSA exemptions. Up to now the underlying note of discord has been played pianissimo. With my finding that both are liable they part company. Georgia Shipping Company pleaded that if the cargo owner is entitled to recover against both, then Trans-Amazonica is liable over to it in whatever amount it is required to pay. The charterer contends that the loss was not caused by any act or omission on its part but was the result of breach of the charter party by Trans-Amazonica and its failure to maintain the vessel in seaworthy condition.

There has been inadequate exploration of the question of liability *inter se* and oral argument is necessary to a decision as to this phase of the litigation. I will,

however, make a few comments at this time in connection with the matter of indemnity.

A commentator writes in a law review article:

"When a shipowner or a charterer incurs liability to cargo interests for cargo loss or damage, whether based upon a breach of the terms of a bill of lading or upon a breach of an obligation imposed by either the Harter Act of COGSA, the charter party must be examined to determine whether a right of indemnity exists between the shipowner and the charterer. In those cases where the charterer is liable to the cargo interests for cargo loss or damage caused by a fault for which the shipowner is liable under the terms of the charter party, the charterer will obviously have a right of indemnity against the shipowner, the principal fault being the shipowner's breach of his warranty of seaworthiness." [3]

There is an implied warranty to a charterer by the shipowner as to the seaworthiness of the vessel when delivered for the intended voyage and the owner has the burden of proving that she was seaworthy at that time. Interstate Steel Corp. v. S. S. "Crystal Gem" *supra*, 120. See also Sea Star, 1970 AMC 1088 (S.D.N.Y., 1970). A shipowner is not entitled to recover from a time-charterer any part of his settlement with a shipper whose goods are damaged as a result of unseaworthiness of a vessel over which the charterer had no control. United States v. S. S. Wabash, D.C., 331 F.Supp. 145. What is the rule in the converse situation where the charterer is forced to pay a cargo loss after judgment? And what is the effect in such a case of lack of satisfactory proof as to unseaworthiness?

As I say, this aspect of the litigation has not been adequately argued and I will withhold decision until that time. All I now decide is that Georgia-Pacific is entitled to recover from Georgia-Steamship

3. John B. Doak, "Liabilities of Stevedores, Terminal Operators, and Other Handlers in Relation to Cargo," XLIV Tulane Law Review, 753.

**942**

Company and Trans-Amazonica, jointly and severally, in the amount stated together with interest and costs. The question of the interest rate and the time from which interest runs will be taken up at a hearing to be held on November 24th next at 9:00 A.M.

### SUPPLEMENTAL ORDER

Interest on the judgment awarded to Georgia-Pacific will be at the rate of 6 percent per annum from October 6, 1968, which is the presumptive date of delivery of the cargo at Savannah.

The burden of proving seaworthiness of the *Island Sun* as well as that of coming forward with an exculpatory explanation as to the cargo damage is on the disponent owner, Trans-Amazonica. It has failed to meet it. As between Trans-Amazonica and Georgia Steamship Company, the latter is entitled to full indemnity for any amount it pays in satisfaction of the judgment awarded to the consignee.